[Sac. No. 3682.  In Bank.—April 15, 1925.]

In the Matter of the Issuance of the Bonds of OROSI PUB-LIC UTILITY DISTRICT, in the County of Tulare, State of California.  OROSI PUBLIC UTILITY DIS-TRICT, Respondent, v. J. F. McCUAIG, Appellant.

[1] PUBLIC UTILITY DISTRICTS—PUBLIC IMPROVEMENTS—BOUNDARIES—BENEFITS—RIGHT TO HEARING.—The legislature itself may create a district to be assessed for the benefit of a public improvement, and determine its boundaries, either by describing them or by laying down a fixed rule by which they may be determined. If it does so, the property owners are not entitled to a hearing on the question of benefits to the land included within the district, for they are conclusively presumed to have been heard through their representatives in the legislature.

[2] ID.—FORMATION OF DISTRICTS—GENERAL PLAN—DETERMINATION OF BOUNDARIES—HEARING ON BENEFITS.—Instead of creating a district to be assessed for public improvements by a special act, the legislature may, by a general law, provide for its formation, and may delegate to some board, commission, or tribunal the determination of what lands shall be included within its boundaries. In the event that the district be formed under such an act, the inquiry becomes judicial in its nature to such an extent that property owners are entitled to a hearing, or an opportunity to be heard, on the question of benefits before their lands are included, as to whether their lands should be assessed at all and as to the amount of the tax to be assessed against them.

[3] ID.—SPECIAL ASSESSMENTS — RIGHT OF TAXPAYER TO NOTICE.— Somewhere during the process of arriving at the amount of any special assessments which may be levied on property the taxpayer must have an opportunity to be heard as to the validity and extent of the tax, and notice and opportunity must be provided as an essential part of the statutory provision.

[4] ID. — ASSESSMENT DISTRICTS — QUASI-MUNICIPAL CORPORATIONS — DIFFERENCE IN.—There is an obvious distinction to be drawn between an act providing for the formation of an assessment district, which practically authorizes property owners without notice to place burdens on the property of others for the sole purpose of improving their own property, and an act providing for the formation of a *quasi*-municipal corporation or a municipality.

[5] ID. — SPECIAL ASSESSMENT DISTRICTS. — Districts such as those formed for the purpose of draining, irrigating, reclaiming, or otherwise directly benefiting the lands affected thereby are created for the purpose generally of some special local improvement, and may exercise only such powers as may be conferred by the legislature in the line of the object of their creation, and the exactions which they may enforce are in the nature of assessments, or taxes for local benefits, to be spread on the property in the districts in proportion to the peculiar advantage accruing to each parcel from the improvement; and such districts are not municipal corporations in the contemplation of the constitution.

[6] ID.—MUNICIPAL CORPORATIONS—ARTICLE XI, SECTION 6, CONSTITUTION.—The provision in article XI, section 6 of the constitution that "corporations for municipal purposes shall not be created by special laws" does not imply that the legislature must, by any general law, provide a plan in which shall be prescribed a mode under which all municipal corporations must be organized and the powers they can exercise.

[7] ID.—AMENDMENT OF 1911 TO ARTICLE XI OF CONSTITUTION.—The amendment of 1911 to article XI of the constitution (Const., art. XI, sec. 19), providing that any municipal corporation may establish and operate public works for supplying its inhabitants with

light, water, power, heat, transportation, telephone service, or other means of communication, definitely settled and removed all doubt as to the right of cities and towns to own and operate the kind of public utilities therein designated.

[8] Id.—Public Utility Districts in Unincorporated Territory—Act of 1921—Purpose of.—The intention of the legislature in passing the act of 1921 (Stats. 1921, p. 906), providing for the organization of public utility districts in unincorporated territory, was to make provision whereby the inhabitants of the state living outside the limits of cities and towns may serve their own purposes through the operation of the same kind of utilities, as the constitution provides that municipalities may establish for themselves, and it was the intention to provide for the creation of public corporations of a *quasi*-municipal character, with power to carry on the particular functions committed to them.

[9] Id.—Orosi Public Utility District—Powers.—It is not necessary that a district like the Orosi Public Utility District shall exercise all the powers of local self-government which usually pertain to municipal corporations. All that was required was that the legislature should vest them, when properly organized, with such governmental powers as in its judgment were necessary to be exercised and appropriate to carry out the purposes for which the districts may have been organized. And it may enlarge or restrict their powers, direct the mode and manner of their exercise, and define what acts they may or may not perform.

[10] Id. — Municipal Corporations — Object of. — The creation of municipal corporations does not have for its sole object the formation of political subdivisions of the state for governmental purposes, but there is also the association of the members of the particular community for the administration of their local business and affairs in matters largely outside of the sphere of government as such; and it is apparent that the legislature had in view such association of the people living in the outlying districts when it enacted the statute for the formation of public utility districts in the unincorporated territory of the state, and it thereby provided for the creation of public agencies or *quasi*-municipal corporations, the declared purpose of the act being to extend to the inhabitants of such districts, when properly organized, advantages in the use and benefit of certain utilities which they might not be able to obtain in any other way, and which tend to promote the general welfare of the people of the state, and the power of the legislature so to do cannot be denied.

[11] Id.—Municipalities—Functions—Taxation.—While a municipality, which undertakes to supply those of its inhabitants who will pay therefor with utilities and facilities of urban life, is performing a function not governmental, but more often committed to private corporations or persons with whom it may come into com-

petition, it is, in fact, engaging in business upon municipal capital, and for municipal purposes; and any tax thereafter levied and collected for the purpose of supplying such municipal capital is not a tax or assessment on property directly benefited by the construction of some local improvement, but is a general tax levied just as, and for the same purpose that, any general municipal tax is imposed for carrying on the governmental functions and utilitarian objects of duly incorporated cities or towns.

[12] Id.—Act of 1921—Constitutionality of.—As the act of 1921, providing for the incorporation of public utility districts in unincorporated territory (Stats. 1921, p. 906), provides for the formation of a public or *quasi*-municipal corporation, inhabitants and property owners of which are subject to tax by the district for municipal purposes only, the act is not unconstitutional.

[13] Id.—Formation of Public Utility Districts—Due Process—Notice and Hearing for Land Owner.—The requirement as to due process of law does not give a property owner an absolute right to notice and hearing before his property may be included within the limits of a municipality or *quasi*-municipal corporation, by reason of the creation of which his property will be subjected only to the burden of a general tax for the purposes for which the district was formed, in contradistinction to a tax or assessment for some local benefit; and a property owner is not entitled to a notice and opportunity to be heard on the question of benefits to his land before it can be included within the boundaries of a public utility district created under the act of 1921 (Stats. 1921, p. 906).

(1) 28 Cyc., p. 1122, n. 13.  (2) 28 Cyc., p. 1122, n. 17.  (3) 28 Cyc., p. 1122, n. 18.  (4) 28 Cyc., p. 130, n. 93.  (5) 28 Cyc., p. 1102, n. 11.  (6) 36 Cyc., p. 1001, n. 24.  (7) 28 Cyc., p. 269, n. 46.  (8) 28 Cyc., p. 128, n. 87.  (9) 28 Cyc., p. 132, n. 17.  (10) 28 Cyc., p. 124, n. 60, p. 125, n. 63.  (11) 28 Cyc., p. 269, n. 46.  (12) 12 C. J., p. 1256, n. 36.  (13) 12 C. J., p. 1257, n. 63.

APPEAL from a judgment of the Superior Court of Tulare County.  W. B. Wallace, Judge.  Affirmed.

The facts are stated in the opinion of the court.

Walter C. Haight for Appellant.

Fred C. Scott and Leroy McCormick for Respondent.

Edward F. Treadwell, *Amicus Curiae.*

WASTE, J.—The Orosi Public Utility District was organized under the provisions of an act providing for the incor-

poration of public utility districts in unincorporated territory. (Stats. 1921, p. 906.) The board of directors of the district brought an action in the superior court of the county of Tulare to determine the validity of an $18,000 bond issue voted by the people of the district for the purpose of raising money for developing, pumping, storing, and distributing water. John F. McCuaig, a resident freeholder and taxpayer, answered the petition, alleging that all proceedings in relation to the issuance of the bonds were null and void for the reason that the utility district was not duly organized and incorporated, because the act of the legislature under which it was formed was unconstitutional. The trial court determined all issues in favor of the due organization and incorporation of the district, and the legality of the bonds, and entered its decree affirming their validity. The taxpayer has appealed on the judgment-roll alone.

The act providing for the incorporation of public untility districts in unincorporated territory states that whenever electors equal in number to fifteen per cent of all the votes cast for all candidates for Governor within such unincorporated territory at the last preceding general election, at which a Governor was elected, desire to organize such a district, they shall sign a petition setting forth the boundaries of the proposed district, and present same to the board of supervisors of the county in which the unincorporated territory is situated. The board of supervisors shall, within fifteen days after the presentation of the petition, publish a copy thereof, together with a statement that the proposition involved therein, which shall be briefly specified, will be submitted by it to the qualified electors of the unincorporated territory at a special election, after publication of the required notice. Within five days after the result of the election is ascertained, if it appears that a majority of the votes cast is in favor of the incorporation of the district, the board of supervisors shall so declare, and shall in a proper order state the name and boundaries of the district, and that such utility district is formed under the provisions of the act (*supra*). After the date of the filing of certain certificates with the Secretary of State, the territory described in the petition shall be deemed incorporated as a public utility district, under the provisions of the statute, with all the rights, privileges, and powers set forth therein.

Under the provisions of the act, any public utility district so formed shall have power to have perpetual succession, to sue and be sued, to adopt and alter a seal, to acquire, hold, and dispose of real and personal property necessary to the full and continued exercise of its power, to acquire, construct, own, operate, control, or use works for supplying the inhabitants of the district with light, water, power, heat, transportation, telephone service, or other means of communication, or means for the disposition of garbage, sewage, or refuse matter, and to do all things necessary or convenient to the full exercise of the powers granted by the act. Whenever there is a surplus of water, light, heat or power above that which may be required by the inhabitants or municipalities within the district, the district may sell or otherwise dispose of the surplus outside of the district. It also may exercise the right of eminent domain for the condemnation of private property for public use, and may construct its works across or along any street or highway, or over the lands and property of the state, and in that connection is given the same rights and privileges as are granted to municipalities. It may borrow money and issue bonds or other evidence of indebtedness within certain limitations, levy and collect, or cause to be levied or collected, taxes for the purpose of carrying on its operations and paying its obligations, and may make contracts, employ labor, and do all acts necessary or convenient for the full exercise of the powers granted to it, which are to be exercised by a board of directors elected by the voters in the district, which board may act by ordinance or resolution signed by its president and attested by the secretary. The act further provides (section 39) that if from any cause the revenues of the district shall be inadequate to pay the principal or interest on any bonded debt as it becomes due, or if funds are needed to carry out the objects and purposes of the district, which cannot be provided for out of the revenues of the district, the board of directors may levy a tax for that purpose on the taxable property situated in the district. It may by ordinance, the provisions of which shall be conformable to the general law, provide the mode and manner of assessing, correcting or equalizing assessments, and the levying and collecting of taxes which may be by actions or legal proceedings; or it may elect to avail itself of the assess-

ment made by the county assessor of the county in which the
district is situated. All taxes levied under the provisions of
the act are a lien on the property on which they are levied,
and the enforcement of the collection of the taxes may be
had in the same manner and by the same means as provided
by law for the enforcement of liens for state and county
taxes.

The act of 1921, as originally enacted, and as it stood
when the respondent district was formed, did not provide
for any notice of the hearing of the petition for the forma-
tion of the district. The property owners within the pro-
posed district were not given an opportunity to protest
against having their property included within its boundaries,
nor were they accorded an opportunity to be heard as to
whether their property was or could be benefited by being
included within such boundaries. For that reason, the ap-
pellant takes the position that the act is unconstitutional and
in contravention of the fourteenth amendment of the federal
constitution, and contrary to similar provisions in the con-
stitution of the state, in that it provides for a taking of his
property without due process of law. It follows, he argues,
that all proceedings taken for the organization of the dis-
trict, and the subsequent proceedings relating to the issue of
the bonds, which are dependent upon the validity of the
organization of the district, are null and void, and, as a
necessary consequence, the bonds sought to be validated by
this proceeding are invalid. After the proceedings involved
in this case were had, the act was amended (Stats. 1923,
p. 299) to provide for a notice and a hearing by the board of
supervisors of the petition for the formation of a utility
district. It is now provided that the board must hear all
competent and relevant testimony offered in support of, or
in opposition to, the petition. It shall make such changes as
it may deem advisable in, and shall define and establish the
proposed boundaries. At the time the proceedings for the
formation of the Orosi District were taken no discretionary
power whatever was vested in any legislative body. Upon
presentation of the petition therefor, the board of supervisors
was compelled to immediately submit the question of the
formation of the district to the voters residing within the
described limits. The question whether or not the exact
territory described in the petition should be included in,
and constitute the utility district, was made to depend solely

upon an affirmative vote of the body of the electorate residing therein. Appellant contends that to permit a district, formed under such a statute, to levy a tax on property for nonpayment of which the property may be sold, is to subject the property owner to deprivation of his property without due process of law.

It is not contended that any of the steps leading to the formal declaration by the board of supervisors of Tulare County that the respondent district was in fact created were omitted, or that they were not properly taken. The sole question to be determined on appeal relates to the constitutionality of the act under which the district was created. Our first consideration is, therefore, directed to the nature of the district which may be formed under its provisions. If it be one formed for the primary purpose of assessing upon the lands within its boundaries benefits to be derived by the lands from some public improvement for which purpose the district is created, we must hold with appellant, and declare the act unconstitutional as violating the "due process clause" of the federal constitution. Such districts can be legally created in but two ways, neither of which was followed in this case. [1] The legislature itself may create a district to be assessed for the benefit of a public improvement, and determine its boundaries, either by describing them or by laying down a fixed rule by which they may be determined. If it does so, the property owners are not entitled to a hearing on the question of benefits to the land included within the district, for they are conclusively presumed to have been heard through their representatives in the legislature. (*Tarpey* v. *McClure*, 190 Cal. 593, 604 [213 Pac. 983]; *Miller & Lux, Inc.*, v. *Drainage Dist.*, 182 Cal. 252, 265 [187 Pac. 1041]; *Fallbrook Irr. Dist.* v. *Bradley*, 164 U. S. 112, 174 [41 L. Ed. 369, 17 Sup. Ct. Rep. 56, see, also, Rose's U. S. Notes].) [2] Instead of creating the district by special act, the legislature may, by a general law, provide for its formation, and may delegate to some board, commission or tribunal the determination of what lands shall be included within its boundaries. In the event that the district be formed under such an act, the inquiry becomes judicial in its nature to such an extent that property owners are entitled to a hearing, or an opportunity to be heard, on the question of benefits before their lands are in-

cluded.   If the district be formed under this method of dele-
gated power, it is essential that the property owners whose
property is to be included shall be given a hearing upon the
question whether their lands should be assessed at all, that
is to say, whether or not such lands would be benefited by
the proposed improvement, and also a hearing upon the
amount of the tax to be assessed against the property.
(*Spencer* v. *Merchant,* 125 U. S. 345, 356 [31 L. Ed. 763, 8
Sup. Ct. Rep. 921, see, also, Rose's U. S. Notes] ; *Fallbrook Irr.
Dist.* v. *Bradley, supra,* p. 174; *Brookes* v. *City of Oakland,*
160 Cal. 423, 431 [117 Pac. 433] ; *Miller & Lux* v. *Board of
Supervisors,* 189 Cal. 254, 261 [208 Pac. 304].)    [3]   Some-
where during the process of arriving at the amount of any
special assessments which may be levied on property the tax-
payer must have an opportunity to be heard as to the validity
and extent of the tax, and that notice and opportunity must
be provided as an essential part of the statutory provision.
(*Security Trust Co.* v. *Lexington,* 203 U. S. 323, 333 [51
L. Ed. 204, 27 Sup. Ct. Rep. 87, see, also, Rose's U. S.
Notes] ; *Central of Georgia Ry.* v. *Wright,* 207 U. S. 127,
138 [12 Ann. Cas. 463, 52 L. Ed. 134, 28 Sup. Ct. Rep. 47].)
The respondent district was not created by the legislature
itself, and the act providing for its formation makes no pro-
vision for the submission of the question, as to what lands
should be included within its boundaries, to any tribunal
before which the property owners, whose lands were included
in the petition, might have a hearing.

[4]   The rule laid down in *Fallbrook Irr. Dist.* v. *Brad-
ley, supra,* which has been so constantly adhered to by this
court in its application to assessment districts formed for
the purpose of assessing upon private lands the benefits to
accrue from the particular public improvement for the con-
struction of which the district was formed (*Miller & Lux* v.
*Board of Supervisors,* 189 Cal. 254, 267 [208 Pac. 304]),
does not apply to every kind of public or *quasi*-public cor-
poration.   There is an obvious distinction to be drawn
between an act providing for the formation of an assessment
district, and which practically authorizes property owners,
without notice, to place burdens on the property of others
for the sole purpose of improving their own property, and
an act providing for the formation of a *quasi*-municipal cor-
poration or a municipality.   (*People* v. *Ontario,* 148 Cal.

625, 632 [84 Pac. 205]; *Wilcox* v. *Engebretsen,* 160 Cal. 288, 293 [116 Pac. 750].) That distinction, it was pointed out in the latter case, is to be made between the proceedings of a board, acting in pursuance of some delegated legislative authority in creating a political subdivision of the state, as a county or a city, a proceeding which does not directly affect private property, and proceedings which do directly charge or affect such property. The respondent takes the position that it is a public corporation, and that any burden, by way of taxation, to be laid on the inhabitants residing within its boundaries is but a tax for municipal purposes. In view of the distinction, pointed out by this court (*supra*), between the acts providing for the formation, on the one hand, of public or *quasi*-public corporations, in the nature of taxing districts, and of municipal corporations, on the other, and in view of the contention of the respondent, the problem which confronts us lies in determining whether or not the act under which the respondent district was created provides for the organization of a district which is in its nature a public corporation, the inhabitants and property owners of which are subject to taxation for municipal purposes without any hearing as to the benefits to be derived from the creation and conduct of such a corporation, or is an assessment district created for the primary purpose of assessing upon private lands the benefits to be derived thereby from the public improvements for which purpose the district is formed. (*Miller & Lux* v. *Board of Supervisors, supra,* p. 267.)

[5] The purposes for which the Orosi District was formed, the appellant contends, are not municipal, and a district formed for such purposes does not possess the essential characteristics of a municipal corporation. If the authorities cited by him were strictly in point, there would be an end to the controversy; but they are not. They deal with questions arising in connection with districts formed for the purpose of draining, irrigating, reclaiming, or otherwise directly benefiting the lands affected thereby. (*People* v. *Reclamation Dist. No. 551,* 117 Cal. 114, 121 [48 Pac. 1016]; *People* v. *Levee Dist. No. 6,* 31 Cal. 30, 34 [63 Pac. 676]; *People* v. *Sacramento Drainage Dist.,* 155 Cal. 373, 382 [103 Pac. 207]; *Pixley* v. *Saunders,* 168 Cal. 152, 160 [141 Pac. 815]; *In re Werner,* 129 Cal. 567, 572 [62 Pac. 97].) When

related to that class of districts, the cases cited are clearly in point. The improvements contemplated by the acts under which they were formed cannot be considered "municipal purposes." (*In re Madera Irr. Dist.*, 92 Cal. 296, 344 [27 Am. St. Rep. 106, 14 L. R. A. 755, 28 Pac. 675] [on rehearing].) One of the distinguishing features of such districts is that they are created for the purpose, generally, of some special local improvement, and may exercise only such powers as may be conferred by the legislature in the line of the object of their creation. They are merely special state organizations for state purposes, created to perform certain work which the policy of the state requires or permits to be done, and to which the state has given a certain degree of discretion in making the improvements contemplated. The other distinguishing feature is that the exactions which such districts may enforce in order to carry out their purposes are in the nature of assessments or taxes for local benefits, to be spread on the property in the districts in proportion to the peculiar advantage accruing to each parcel from the improvement. (*Pasadena Park Imp. Co.* v. *Lelande,* 175 Cal. 511, 512 [166 Pac. 341].) Such an exaction is generally in the form of a special assessment, but even if it is in the form of a tax it is nevertheless an assessment for local benefits. (*City of San Diego* v. *Linda Vista Irr. Dist.,* 108 Cal. 189, 193 [41 Pac. 291].)

Districts of the nature just discussed are not municipal corporations in the contemplation of the constitution. (*People* v. *Sacramento Drainage Dist., supra,* p. 382; *Reclamation Dist. No. 551* v. *County of Sacramento,* 134 Cal. 477, 478 [66 Pac. 668].) **[6]** But the provision in article XI, section 6, that "corporations for municipal purposes shall not be created by special laws" does not imply that the legislature must, by any general law, provide a plan in which shall be prescribed the mode under which all municipal corporations must be organized and the powers they can exercise. Of interest in this connection is the language of the court in *In re Madera Irr. Dist.,* 92 Cal. 296 [27 Am. St. Rep. 106, 14 L. R. A. 755, 28 Pac. 272], where, at page 317, it says: "Such corporations are but the agents or representatives of the state in the particular locality in which they exist. They are organized for the purpose of carrying out the purposes of the legislature in its desire to provide

for the general welfare of the state, and in the accomplishment of which legislative convenience or constitutional requirements have made them essential. Although in this state the legislature is required to provide such agencies under general laws, it is authorized, under its general power of legislation, to invest such corporations, when created, with the same powers which, without such restriction, it could itself have exercised; and in providing for such organizations it need confer upon them only such powers as, in its judgment, are proper to be exercised by them in the discharge of the particular functions of government which may be conferred upon them. Being the representatives of the legislature in the various localities of the state, the requirements for organization, as well as the powers to be exercised, vary with the character of the purpose for which they may be created. Hence the general laws which the legislature may enact for the organization of public corporations may be as numerous as the objects for which such corporations may be created. For each of these objects the law is the same, but there would be a manifest impropriety in requiring that the organization of a levee district or an irrigation district should be conducted in the same manner as the organization of a corporation for the management of a public park or the control of the school department. Whether the districts to which such general laws are applicable, or in which the people thereof may avail themselves of the privilege conferred, be many or few, is immaterial. Even if there be but a single district to which the law is applicable, at the time of its enactment, the legislature would be justified, under its legislative power, to pass general laws in making such provision for that district. Whenever a special district of the state requires special legislation therefor, it is competent for the legislature, by general law, to authorize the organization of such district into a public corporation, with such powers of government as it may choose to confer upon it. It is not necessary that such public corporation should be vested with all governmental powers, but the legislature may clothe it with such as, in its judgment, are proper to be exercised within and for the benefit of such district. Being created for the purpose of discharging only one public purpose, it is not requisite that it have power not necessary therefor, or which would be appropriate to a

corporation organized for some other purpose. Neither is
it requisite that such corporation should have legislative or
judicial powers conferred upon it. It may be organized for
the mere purpose of exercising executive and administrative
functions, with the added power of making such prudential
rules and regulations as may be necessary for the exercise of
the particular functions entrusted to its charge.''

[7] . With this power of the legislature understood, the
nature of the districts contemplated by the act under which the
Orosi Public Utility District was created is more clearly dis-
cerned. In 1911 the constitution of California was amended
to provide that ''any municipal corporation may estab-
lish and operate public works for supplying its inhabitants
with light, water, power, heat, transportation, telephone ser-
vice, or other means of communication. Such works may be
acquired by original construction, or by the purchase of ex-
isting works, including their franchises, or both.'' (Const.,
art XI, sec. 19.) The amended section is radically different
from the one it replaced. In the statement of legislative
reasons for the adoption of the amendment, printed and
transmitted to the voters by the Secretary of State, it is
stated that the conditions which prevailed in this state with
regard to the operation of public utilities in cities at the
time of the adoption of the new constitution of 1879 had
materially changed, and an entirely new situation existed
regarding the subject to which the section related. ''The
proposed amendment,'' the statement continues, ''is designed
to provide for conditions as they now are, and as they will
doubtless continue to be in the future.'' After a discussion
of the situation arising during the period following 1879, and
a declaration that the result ''has been a distinct disappoint-
ment, like many other attempts to remedy economic condi-
tions by force of statutes, . . . the true remedy, so far as
any substantial benefit to the people is concerned;'' the state-
ment declares, ''is to encourage the furnishing of these pub-
lic necessities by municipal corporations themselves.'' The
adoption of the amendment definitely settled and removed
all doubt from the question of the right of cities and towns
to own and operate the kind of public utilities designated
by the constitution. [8] In enacting the statute here in
question, the legislature has made provision whereby the in-
habitants of the state living outside the limits of cities and

towns may serve their own purposes through the operation
of the same kind of utilities, when organized for that pur-
pose.

That such was the intention of the legislature may be
gleaned from a reading of the provision declaring the pur-
poses for which public utility districts may be created in
unincorporated territory. They are the acquisition, con-
struction, and use of works for supplying the inhabitants of
the district with light, water, power, heat, transportation,
telephone service, or other means of communication, or means
for the disposition of garbage, sewage, or refuse matter. It
has the power to do all things necessary or convenient to the
full exercise of the powers granted by the act. It is signifi-
cant that, when the legislature came to pass the act extend-
ing to the inhabitants outside of incorporated cities and
towns the privileges in regard to the acquisition and use of
their own public utilities that are granted by the state
constitution to municipalities, it should have followed so
closely the language of the constitutional amendment of 1911
in the statement of the purposes for which the districts may
be created. We are convinced that it was its intention to
provide for the creation of public corporations of a *quasi-*
municipal character, with power to carry on the particular
functions committed to them.

"A city or purely municipal corporation is perhaps the
highest type of corporation created for municipal purposes,
because it is a miniature government, having legislative, ex-
ecutive and judicial powers, but there is another class of cor-
poration, such as counties, school districts, road districts,
etc., which, though varying in application and peculiar feat-
ures, are but so many agencies or instrumentalities of the
state to promote the convenience of the public at large, and
are, in the broadest use of the term, for municipal purposes."
(*Cook* v. *Port of Portland,* 20 Or. 580, 583 [13 L. R. A.
533, 27 Pac. 263].) [9] It is not necessary, therefore,
that a district like the Orosi Public Utility District shall
exercise all the powers of local self-government which
usually pertain to municipal corporations. All that was re-
quired was that the legislature should vest them, when prop-
erly organized, with such governmental powers as in its
judgment were necessary to be exercised and appropriate
to carry out the purposes for which the districts may have

been organized.    (*In re Madera Irr. Dist., supra.*)    It may enlarge or restrict their powers, direct the mode and manner of their exercise, and define what acts they may or may not perform.    (*San Francisco* v. *Canavan,* 42 Cal. 541, 552.)

[10]    The creation of municipal corporations does not have for its sole object the formation of political subdivisions of the state for governmental purposes, but there is also the association of the members of the particular community for the administration of their local business and affairs in matters largely outside of the sphere of government as such. (*Union Stone Co.* v. *Board of Freeholders of Hudson Co.,* 71 N. J. Eq. 657, 664 [65 Atl. 466, 469]. See, also, *Wilson* v. *Board of Trustees,* 133 Ill. 443, 464 [27 N. E. 203].)    It is quite apparent to us that the legislature had in view such association of the people living in the outlying districts, when it enacted the statute providing for the formation of public utility districts in the unincorporated territory of the state. It thereby provided for the creation of public agencies or *quasi*-municipal corporations, the declared purpose of the act being to extend to the inhabitants of such districts, when properly organized, advantages in the use and benefit of certain utilities which they might not be able to obtain in any other way, and which, from common experience, we know tend to promote the general welfare of the people of the state.    That it had the power to do so cannot be denied. While the proposed constitutional amendment was pending in 1911, this court held that there was no provision in the state constitution which either expressly or by implication forbade the acquisition, ownership, or operation of public utilities by a municipality, or which prohibited the legislature from granting a municipality the power to acquire, own, and operate them.    (*Clark* v. *Los Angeles,* 160 Cal. 30, 46 [116 Pac. 722].)    Activities, once regarded as being of a strictly private nature, are now considered municipal affairs, e. g., the sale and distribution of electrical energy manufactured by a city, the supplying of water to its own inhabitants or to outside territory, the construction of a reservoir by a city on its own land and to be used for the benefit of its inhabitants, and the establishment and operation of transportation service.    (*Los Angeles G. & E. Corp.* v. *Los Angeles,* 188 Cal. 307, 317 [205 Pac. 125] ; *Heilbron* v. *Sumner,* 186 Cal. 648, 651 [200 Pac. 409] ; *South Pasa-*

*dena* v. *Pasadena Land & Water Co.*, 152 Cal. 579, 594 [93 Pac. 490]; *Williams* v. *City of Vallejo*, 36 Cal. App. 133, 139 [171 Pac. 834]; *United Railroads* v. *San Francisco*, 249 U. S. 517, 520 [63 L. Ed. 739, 39 Sup. Ct. Rep. 361, see, also, Rose's U. S. Notes Supp.].) The people of the state, by the amendment to the constitution, placed other public utilities in the same category.

[11] We take it to be now a generally accepted proposition that, while a municipality, which undertakes to supply those of its inhabitants who will pay therefor with utilities and facilities of urban life, is performing a function not governmental, but more often committed to private corporations or persons with whom it may come into competition, it is, in fact, engaging in business upon municipal capital, and for municipal purposes. (28 Cyc. 125.) Any tax, therefore, levied and collected for the purpose of supplying such municipal capital is not a tax or assessment on property directly benefited by the construction of some local improvement, but is a general tax levied just as, and for the same purpose that, any general municipal tax is imposed for carrying on the governmental functions and utilitarian objects of duly incorporated cities or towns.

The conclusion we have reached, on the general consideration of the act under which the respondent district was formed, is confirmed by an examination of the provision of the statute relating to the necessary revenue for conducting the affairs of such public corporations. It is provided (section 38) that only revenue-producing utilities shall be acquired, owned, or operated, "the intention being . . . that each public utility owned and operated by the district shall be self-sustaining." To that end, it is provided that, so far as possible, the board of directors shall fix such charges for commodities or service furnished by its revenue-producing utilities as will pay the administrative expenses of the government of the district, the operating cost of the utilities, the interest on any bonded indebtedness, and, in addition, provide a sinking fund for the retirement of the principal of the debt, and an appropriate fund for repairs, replacements and betterments. These provisions clearly establish the contention that the essential purpose of the act is to form a *quasi*-municipal corporation which may acquire and operate public utilities and pay for their operation from

rates to be paid by those enjoying the service. When the cost of any public utility to be acquired, completed, or constructed can be paid out of the revenues of the district derived from the operation of its public utilities, in addition to the other necessary expenses of the district, the board of directors must determine the cost of such utility, the method and manner of payment therefor, and submit the question of its acquisition upon such terms to the electors. If the cost cannot be met in that way, a district bonded indebtedness may be incurred in the manner provided by the act. It is only when the revenues of the district shall be inadequate to pay the principal or interest of any bonded debt, as it becomes due, that the board of directors must, or, when funds are needed to carry out the objects and purposes of the district which cannot be provided for out of its revenues, that the board of directors may levy a tax for such purposes (section 39). These provisions make it clear that the "primary purpose" of the act (*Miller & Lux* v. *Board of Supervisors, supra*) was not that of assessing upon private lands the benefits to be derived from the acquisition of public utilities.

[12] From our conclusion that the act, under which the respondent district was created, provides for the formation of a public or *quasi*-municipal corporation, the inhabitants and property owners of which are subject to tax by the district for municipal purposes only, it follows that the attack here made on the constitutionality of the act must fail. The public utility districts provided for by its terms have as their sole purpose the welfare and prosperity of the people of the state—matters which rest within the will of the people themselves. In *People* v. *Town of Ontario,* 148 Cal. 625 [84 Pac. 205], this court considered the constitutionality of the act providing for the annexation of territory to incorporated towns and cities. (Stats. 1889, p. 358.) By the terms of the act, upon receipt of a proper petition, signed by the requisite number of electors of the municipality and exactly describing the territory desired to be annexed, the legislative body of the municipality is compelled to submit the question of annexation to the electors of the town, and also to those of the outside territory. No notice, or opportunity to be heard on the question, is afforded residents or property owners of either the town or the ter-

ritory which it is proposed to annex, and the legislative body has no power to change or fix the boundaries. The sole question whether or not the exact territory described in the petition shall be annexed and thereby subjected to the burden of taxation for municipal purposes is made to depend entirely upon an affirmative vote of the electors at the election called for the purpose. That is the exact situation as to the boundaries of public utility districts in unincorporated territory, created under the act as it was when the respondent district was formed. The court pointed out the "obvious distinction" between those acts practically authorizing property owners, without notice, to place burdens upon the property of others for the sole purpose of improving their own property, and one providing for the formation of municipalities. It held that, as the legislature cannot itself declare the precise boundaries of a municipality, for it can act in such matter only by general laws, it might, in the absence of any constitutional inhibition, confer that power on the electors of the district to be affected, such declaration to be made at an election held after due notice. (See, also, *People ex rel. Rhodes* v. *Fleming*, 10 Colo. 553 [16 Pac. 298]; *Ford* v. *North Des Moines*, 80 Iowa, 626 [45 N. W. 1031].) The constitution does not attempt to limit the power of the legislature in providing for the determination of the question as to what shall constitute municipal territory. Consequently, in the matter of forming cities or towns, questions as to population, extent, and character of territory to be included are matters left entirely with the legislative department. (*People ex rel. Russell* v. *Town of Loyalton*, 147 Cal. 774, 778 [82 Pac. 620].)

[13] In the instant case the district has been formed within the strict letter of the law, and in the manner provided by the legislative enactment. We have been cited to no authorities which hold that the requirement as to due process of law gives a property owner an absolute right to notice and hearing before his property may be included within the limits of a municipality or a *quasi*-municipal corporation, by reason of the creation of which his property will be subjected only to the burden of a general tax for the purposes for which the district was formed, in contradistinction to a tax or assessment for some local benefit. Appellant was not, therefore, entitled to notice and opportunity to be

heard on the question of benefits to his land before it could be included within the boundaries of the respondent district. The act under which it was formed directs that in the event it becomes necessary to levy a tax for carrying out the objects and purposes of the district, the board of directors may, by ordinance, provide the manner and mode of assessing, and of correcting and equalizing assessments upon, the taxable property situated within the district, and may provide for the collection of delinquent taxes by actions or legal proceedings, *provided* that the provisions of such ordinance shall be conformable to general law, or it may accept the assessment for district purposes made by the county assessor (section 39). Whatever may be the method of assessment that shall be adopted, if provision be made for the correction of errors committed by the assessor, through a board of revision or equalization, with power to hear, after notice, complaints respecting the justice of the assessment, the proceeding by which the valuation is determined, though it may be followed, if the tax is not paid, by a sale of the delinquent's property, is due process of law. (*Hagar* v. *Reclamation Dist. No. 108,* 111 U. S. 701, 710 [28 L. Ed. 569, 4 Sup. Ct. Rep. 663, see, also, Rose's U. S. Notes] ; *Fallbrook Irr. Dist.* v. *Bradley, supra,* at p. 175; *People* v. *Town of Ontario, supra,* at p. 633.)

We deem it unnecessary to further discuss the decisions of this court and those of other jurisdictions so strongly relied on by appellant. Many of them have already been referred to and their distinguishing features pointed out. We have carefully examined every one of them, and many others, and have not found one that is exactly in point. The reason for the dearth of precise judicial decision on the important question we have been called on to decide in this case is that public utility districts are new to the law of California, and the furnishing of what may be called public utility service is an extension of municipal functions of comparatively recent times. After a critical study of the authorities, we have found nothing that destroys our confidence in the conclusion we have reached in this case. The case cited by appellant, and which, on first reading, seems nearest in point to the question here involved (*People ex rel. Amestoy Estate Co.* v. *Van Nuys Lighting Dist.,* 173 Cal. 792 [Ann. Cas.

1918D, 255, 162 Pac. 97]), is readily distinguishable on the facts given by the court as the foundation for its decision.

The judgment of the lower court is affirmed.

Myers, C. J., Seawell, J., Richards, J., Shenk, J., Lawlor, J., and Lennon, J., concurred.