[Civ. No. 6360. Second Appellate District, Division Two.—March 26, 1929.]

PALOS VERDES LIBRARY DISTRICT OF LOS ANGELES COUNTY (a Public Corporation), Petitioner, v. R. F. McCLELLAN, Respondent.

Everett W. Mattoon, County Counsel, and J. H. O'Connor, Assistant County Counsel, for Petitioner.

O'Melveny, Tuller & Myers and Paul E. Schwab for Respondent.

CRAIG, J.—Pursuant to a petition therefor, signed by more than fifty taxpayers and residents of the unincor-

porated village or town of Palos Verdes Estates, in Los Angeles·County, the board of supervisors by resolution enacted that on January 31, 1928, between the hours of 1 P. M. and 7 P. M., an election be held to determine whether or not a library district should be formed in accordance with the provisions of the act of April 12, 1909 (p. 815). In said petition and resolution it was recited that the territory to be included in such district is entirely located within the county of Los Angeles, and the same was described by metes and bounds. A notice of election was accordingly given by posting in three of the most public places in said district, but there being no newspaper published·within the boundaries thereof, "no publication of said notice in any newspaper was given or made." It is alleged that on the date mentioned an election was held between the hours of 1 P. M. and 7 P. M., at which election the question was submitted by ballots to the qualified electors, and that of 238 qualified electors forty-five voted, forty-four of whom cast their votes in favor of the proposition and but one opposed it. Thereafter, at a regular meeting of the supervisors the returns of said election were canvassed, and by resolution reciting the antecedent proceedings, it was enacted that "a public library district to be known and designated as Palos Verdes Library District be and the same is hereby ordered formed." It is alleged by both parties to this proceeding that no hearing was had before the board of supervisors as to the extent of the boundaries of the proposed district or upon the question as to whether or not the lands within its limits would be benefited by being included therein; that no taxpayer had an opportunity to be heard as to the extent of the tax to be imposed upon him or as to whether or not his land should be included in such proposed district. By a subsequent resolution the supervisors directed that an election be held on June 28, 1928, between the hours of 8 o'clock A. M. and 7 o'clock P. M. of said day, for the voting of bonds in the amount of $90,000 and authorizing their sale, for the purpose of establishing and equipping a library. On the date last mentioned seventy-five votes were cast, sixty-eight of which were in favor of the bond issue, and seven were opposed thereto. It is alleged by the petitioner that at least thirty-five of such ballots were cast between the hours of 1 o'clock P. M. and 7 o'clock P. M. Following a canvass

of the election the board of supervisors ordered and directed that the chairman of said board and the county auditor sign each bond, and that they be issued and sold. Bids having been submitted to the trustees and accepted, the bonds were issued and presented to the chairman of the board of supervisors for his signature. Respondent refused to sign them, contending, as he here insists, that (1) the statute under which the library district was formed is unconstitutional and void, in that it fails to provide for a hearing upon the extent of the boundaries of a proposed district or upon the amount of benefits to property included therein; (2) that the district was not legally organized, for the reason that notice of the election with respect to organization was not published in any newspaper; and (3) that the proceedings authorizing the issuance of the bonds were void by reason of the fact that the polls were open from 8 o'clock A. M. until 7 o'clock P. M., whereas the lawful period of time for holding such an election is from 1 o'clock until 7 o'clock P. M. Petitioner herein prays that respondent be required by writ of mandate from this court to affix his signature to each of said bonds, and insists that the statute is constitutional, that publication of said notice was not required, and that a sufficient number of ballots having been cast within the legal limitation of time, the fact that the polls were actually open and other votes were received before 1 o'clock P. M. did not invalidate the proceedings.

In support of the respondent's refusal to execute the bonds in question, the act under which the petitioning district was created is attempted to be placed in the same category with the legislation authorizing the creation, conduct and maintenance of highway lighting districts, which latter enactment was held unconstitutional upon the grounds above mentioned.

It was provided by section 2 of the Lighting District Act (Stats. 1909, p. 551) that: "Any unincorporated town or village of this state may establish a highway lighting district for the purpose of installing and maintaining a system of street lights on public highways, for the better protection of its residents, in accordance with the provisions of this act."

Other sections thereof recite that the county supervisors shall *ex officio* constitute the supervisors of the district,

that they shall invite bids and accept only those offering gas or other lighting commodity at rates not exceeding the rates paid by the county for highway lighting in other portions of the county; that the lighting is "for the better protection of its residents." The supervisors of the county have power to make rules, regulations and laws for the administration, operation and maintenance of the district; to estimate the cost thereof for each ensuing year, which, added to the rate paid to the contracting distributors, is taxable to the property within the lighting district at the equalized value thereof.

In *People* v. *Van Nuys Lighting District*, 173 Cal. 792 [Ann. Cas. 1918D, 255, 162 Pac. 97], quoting, in part, from *Fallbrook Irrigation District* v. *Bradley*, 164 U. S. 112 [41 L. Ed. 369, 17 Sup. Ct. Rep. 56], it was said: "In all substantial particulars regarding this question the act was similar to the lighting district act here involved. The court recognized the fact that the formation of such districts involved two distinct features, one of which was the creation of a public corporation and the other the levying of an assessment or special tax upon property benefited by the proposed improvement. With respect to the creation of the corporation the court said: 'There is nothing in the essential nature of such a corporation, so far as its creation only is concerned, which requires notice to or hearing of the parties included therein before it can be formed. It is created for a public purpose, and it rests in the discretion of the legislature when to create it and with what powers to endow it.' (See, also, *People* v. *California Fish Co.*, 166 Cal. 576, 606, 610 [138 Pac. 79].) With respect to the other consequences the court said: "In the act under consideration, however, the establishment of its boundaries and the purposes for which the district is created, if it be finally organized by reason of the approving vote of the people, will almost necessarily be followed by and result in an assessment upon all the lands included within the boundaries of the district. The legislature thus in substance provides for the creation not alone of a public corporation but of a taxing district whose boundaries are fixed, not by the legislature, but, after a hearing, by the board of supervisors.' The court then proceeds to declare that when the power to form such district is delegated to a local board or tribunal, it acts judicially in

fixing the boundaries, and the parties whose lands are proposed to be included are entitled to a hearing upon the question of benefits, before the formation of the district, and to have their lands excluded if it appears that they are not benefited.''

The petitioner likens library districts to school districts in this respect, and maintains that no *lands* are benefited or affected by the library service, that the creation of such districts does not result in an assessment, or permit of the exclusion of the property of any inhabitant thereof, and that neither notice nor hearing upon these questions is required.

Section 1, article IX, of the constitution of California, which article relates to education, provides: ''A general diffusion of knowledge and intelligence being essential to the preservation of the rights and liberties of the people, the legislature shall encourage by all suitable means the promotion of intellectual, scientific, moral and agricultural improvement.''

Sections 1 and 15, respectively, of the Library District Act (Stats. 1909, p. 815), read as follows:

''Any unincorporated town or village of this state may establish, equip and maintain a public library for the dissemination of a knowledge of the arts, sciences and general literature, in accordance with the provisions of this act.''

''Every public library established under the provisions of this act shall be forever free to the inhabitants and nonresident taxpayers of the library district, subject always to such rules, regulations and by-laws as may be made by the board of library trustees; . . . ''

It is therein further provided that the board of supervisors of the county where the district is situated shall appoint three trustees, who shall be vested with power to make and enforce all rules, regulations and by-laws necessary for the administration, government and protection of libraries and library property; that they shall estimate the cost thereof for each ensuing year, and report the same to the supervisors of their county; that they may borrow from and loan to libraries books, periodicals, magazines, etc.; they must be ''open for the use of the public during every day in the year,'' alike to residents, to nonresident taxpayers, and to nonresidents who pay no taxes, under such conditions as the trustees may impose.

It will thus be seen that, subject to the appointment of trustees by the county supervisors, and reporting to the latter of each annual estimate of the cost of maintenance, a library district, as distinguished from a highway lighting district, is wholly local in management and control, and is independent of the county government. That a public library is educational in character has repeatedly been held when its liability to taxation has been questioned. In *Webster City* v. *Wright County*, 144 Iowa, 502 [24 L. R. A. (N. S.) 1205, 123 N. W. 193], the supreme court of Iowa, in construing the statutes of that state, exhaustively reviewed the authorities of various states, and concluded:

"Indeed, it would seem that little doubt should be entertained regarding the educational character of such institutions. On no other theory can a tax levy in their support be sustained. The national bureau of education at Washington has always taken the position that public libraries are institutions of learning. In interpreting the will of John Crerar, the founder of the great public library of Chicago, Judge Tuley, at circuit, said in an opinion, adopted by the appellate court as its own: 'Such a library, beyond dispute, is a great public blessing to all within its range, rich and poor alike. It will make all of them wiser and better and more useful and powerful for good in all the relations of life. It is pre-eminently an educational institution, because its benefits will extend to a larger body of people than can be reached by any college or other school of learning.' *Crerar* v. *Williams*, 44 Ill. App. 497; s. c., 145 Ill. 625 [21 L. R. A. 454, 34 N. E. 467]. In this state a library is considered to be within the proper range of school apparatus, for the state expressly authorizes the acquirement and use of books by a school township and rural independent districts, and the establishment of small libraries to aid in the dissemination of knowledge. (See Acts 28th Gen. Assem., chap. 110, p. 83.) Indeed, it is quite generally conceded that Carlisle was right when he said that the true university of today is a collection of books."

We are satisfied that the distinction, both in legislative intent and in fact, between lighting districts and their kin, and library districts, is patent. The former are maintained for the supplying to the public of a *utility*, which may be furnished by private capital or by a municipality. (3

Rawle's Bouvier's Law Dictionary, 3d rev., p. 2766; 3 Dillon on Municipal Corporations, 5th ed., p. 2089, sec. 1290.) The latter are conducted for the general diffusion of knowledge and intelligence, and are educational, as well as *quasi* municipal. (*In re Orosi Public Utility District,* 196 Cal. 43 [235 Pac. 1004].)

In the case last cited educational districts are declared to be *quasi* municipal in character, and our supreme court said that there is an obvious distinction between acts providing for their formation, and acts under which are created public utility corporations or assessment districts which practically authorize property owners to place burdens upon the property of others, without notice, for the sole purpose of improving their own property. It was further said that the constitution does not attempt to limit the power of the legislature in providing for the determination of the question as to what shall constitute municipal territory. The decision quotes with approval from *Cook* v. *Port of Portland,* 20 Or. 580 [13 L. R. A. 533, 27 Pac. 263], that:

" 'A city or purely municipal corporation is perhaps the highest type of corporation created for municipal purposes, because it is a miniature government, having legislative, executive and judicial powers, but there is another class of corporation, such as counties, school districts, road districts, etc., which, though varying in application and peculiar features, are but so many agencies or instrumentalities of the state to promote the convenience of the public at large, and are, in the broadest use of the term, for municipal purposes.' "

It is there plainly pointed out that in discerning the distinction for the purpose of determining the applicability of the "due process" rule, the problem lies in deciding whether or not the act under which the district was created provides for the organization of a district which is in its nature a public corporation, the inhabitants and property owners of which are subject to taxation for municipal purposes without any hearing as to the benefits to be derived from the creation and conduct of the corporation, or is an assessment district created for the primary purpose of assessing upon private lands the benefits to be derived thereby from the public improvements for which purpose the district was formed. That the exactions which public utility corpora-

tions may enforce "are in the nature of assessments or taxes for local benefits, to be spread on the property in the districts in proportion to the peculiar advantage accruing to each parcel from the improvement. . . . Districts of the nature just discussed are not municipal corporations in the contemplation of the constitution." And, in denouncing the rule as to the other class of districts, it is said:

"We have been cited to no authorities which hold that the requirements as to due process of law gives a property owner an absolute right to notice and hearing before his property may be included within the limits of a municipality or *quasi*-municipal corporation, by reason of the creation of which his property will be subjected only to the burden of a general tax for the purposes for which the district is formed, in contradistinction to a tax or assessment for some local benefit."

We conclude that the statute is not unconstitutional as depriving taxpayers within a proposed library district of property without due process of law, by including their property therein without notice, and without opportunity to object to the intended boundaries. In respondent's briefs it is not seriously urged that the omission of a provision requiring such notice from acts authorizing the creation of educational districts would nullify them. It is, however, insisted upon cited authority that there is in this respect a distinction between school districts and park districts, since the latter, like public streets, confer special benefits upon neighboring property. From what has already been observed we do not deem it necessary to further discuss this phase of the question, as it does not tend to alter the conclusion heretofore reached.

It is next asserted that, assuming the statute to be constitutional, the proceedings were illegal because the notice of election was given only by posting, and was not published in a newspaper. The Library Act provides that upon filing with the board of supervisors of a petition by fifty or more taxpayers and residents of a town or village the board must order an election to be held in the proposed district, and shall appoint three qualified electors *thereof* to conduct the same. And section 3 of that act requires that: "Said election shall be called by posting notice thereof in three of the most public places in said proposed library district and

by publication in a daily or weekly paper *therein,* if there be one, at least once a week for not less than fifteen days."

Respondent strenuously insists that while no newspaper was actually printed within the prescribed boundaries of the proposed district, a daily or weekly paper was published in the city of Redondo, which was the nearest point thereto, and that publication should have been made therein. Although certain code sections are discussed in the briefs, both sides state that they do not apply in this proceeding. The sections referred to are 4458 to 4466, inclusive, of the Political Code. ■ We agree with counsel that these provisions are general and do not control where, as in this instance, a special provision has been enacted for the particular proceeding. (*County Sanitation Dist.* v. *Payne,* 197 Cal. 448 [241 Pac. 264].) We are not here concerned with a statute where such terms as "newspaper of general circulation," "published," or "established, printed and published" are employed. Cases cited in which it has been held that where such terms are used the paper may be maintained and issued at a point outside of the district do not aid us. The plain wording of this act requires that the newspaper be within the district. There is no mention of the publication being within its boundaries. The requirement is that if there be a daily or weekly paper in the proposed library district notice shall be published in it. No other interpretation can, we think, reasonably be given to the language of section 3 of the act.

We think that had the legislature intended the publication of notice in a newspaper published and printed outside of the proposed district but at the nearest point thereto and circulated in the district, it doubtless would have so specified, or have omitted the four qualifying words, "if there be one." In other instances the intention of the legislature is expressly indicated by various sections of the Civil Code and Code of Civil Procedure.

A summons in proceedings to quiet title must be published "in some newspaper of general circulation and published in the county where the property is situated, and *if there be no such paper* in such county, then in some adjoining county to be designated by the court or judge thereof." (Code Civ. Proc., sec. 750.)

Notice of assessment of corporate stock must be given by publication in "some newspaper of general circulation, pub-

lished at the principal place of business of the corporation," and, "if there be no newspaper published at the place designated as the principal place of business of the corporation, then the publication must be made in some other newspaper of the county, *if there be one,* and if there be none in a newspaper published in some adjoining county." (Civ. Code, sec. 336.)

Certificates relating to partnerships must be published "in a newspaper published in the county, *if there be one,* and if there be none in such county, then in a newspaper in an adjoining county," or, "in the nearest county thereto." (Civ. Code, secs. 2466, 2483.)

Since no daily or weekly newspaper was printed or published within the limits of Palos Verdes Library District, notice of the election for its incorporation could not be so published therein, and we conclude that the law does not require it to be published in a newspaper printed and published in an adjoining municipality.

█ Finally, respondent contends that the proceedings were irregular because the polls were opened at 8 o'clock A. M., whereas section 22 of the Library Act provides that in such districts they "must not be opened before one o'clock P. M., and must be kept open not less than six hours." Petitioner contends that had the seven opposing votes heretofore mentioned been cast between 1 o'clock and 7 o'clock P. M., more than two-thirds of the qualified electors voting expressed their assent to the bond issue, and that the result was not affected by this deviation from the statute. Respondent insists that forty, or more than one-half of the ballots having been cast before the statutory hour for opening the polls, less than two-thirds of the qualified electors who voted cast legal ballots.

In *Kenworthy* v. *Mast,* 141 Cal. 268 [74 Pac. 841], wherein it appeared that the polls in two precincts did not open until 7:45 and 8:10 o'clock A. M., respectively, under a statute requiring the commencement of balloting at 6 o'clock A. M., it was held that the votes of qualified electors in those precincts should not be rejected. The rule of this state is there stated in the following language: "It is said that the provisions as to time and place of holding an election are mandatory, and that the departure from those requirements was in this case so substantial as to forbid any

inquiry as to whether or not any injury resulted. That a literal compliance with the provisions of the law as to the hour of opening the polls is absolutely essential to the validity of the vote of a precinct has never been held in this state, and no good reason can be conceived for so holding. Learned counsel for respondent admit that even the disobedience of a mandatory statute must be liberally construed, and that, if the departure therefrom is slight, and it can easily be determined that no injury resulted therefrom, the vote will not be rejected. It was said by this court in *Atkinson* v. *Lorbeer,* 111 Cal. 419, 421 [44 Pac. 162] : 'Of course, neither the voters nor those voted for have any control over election officers, and to set aside the vote of a precinct, when there was clearly no fraud or any mistake affecting the result, for mere irregularities occasioned by the ignorance or carelessness of election boards would, in many cases, be a patent injustice. Moreover, a construction requiring an exceedingly strict compliance with all statutory provisions might tempt to irregularities contrived for the very purpose of vitiating the vote at a certain polling-place, and as was said in *Whipley* v. *McKune,* 12 Cal. 361: "might lead to more fraud than it would prevent." '

"On the other hand the election laws should not be so construed as to open the door to future frauds which it is the purpose of those laws to prevent. It is practically impossible to lay down any general rule covering all cases, but we think the true test to be applied to departures from the requirements of the laws relating to the conducting of elections on the proper day and at the proper place, be those requirements called mandatory or directory, is as to whether or not the particular departure is of such a nature as to make it impossible or extremely difficult to determine, under the circumstances of the case, whether fraud had been committed or anything done which would affect the result. If, as was said in *Atkinson* v. *Lorbeer, supra,* speaking of a departure from a so-called 'directory' provision, it may be easily shown that the departure was not accompanied with fraud or any act affecting the result, and such showing is made, the vote will not be rejected. If, on the other hand, the departure from the law is so gross as to give rise to a suspicion of fraud or unfairness, and the circumstances are such that in the nature of things no evidence as to the effect thereof

could be satisfactory, a court will not enter upon the task of inquiry.''

Again, in *People ex rel. Escalle* v. *Town of Larkspur,* 16 Cal. App. 169 [116 Pac. 702], it appeared that the polls were not opened until two and one-half hours later, and were closed one hour earlier, than the time fixed by the statute. It was contended that between 6 o'clock A. M. and the opening of the polls a number of qualified electors appeared and were turned away because the official ballots had not arrived, and that twelve electors cast ballots which they wrote out in full upon blank paper; that ''all of said electors worked outside the territory hereinabove set forth and some of them would have voted against incorporation.'' In affirming a decree declaring the election valid, it was said:

''So that, in any view of the facts the expression at the polls showed that a majority of all the electors who were entitled to vote was in favor of incorporation. We are next to inquire whether, in such a case, the will of the majority is to be set aside on the ground now urged. We think the principles enunciated in the well-considered case of *Kenworthy* v. *Mast,* 141 Cal. 268 [74 Pac. 841], are decisive of the question. The general rule laid down in McCrary on Elections, section 165, is quoted approvingly, namely, that where there is no statutory provision expressly declaring that a failure, in the respect now being considered, shall render the election void, it will be regarded as directory only, and that, unless the deviation from the legal hours has affected the result, it will be disregarded, but that if such deviation is great, or even considerable, the presumption will be that it has affected the result, and the burden will be upon him who seeks to uphold the election to show affirmatively that it has not. That burden was successfully borne in the present case.''

So, in the instant case, to deduct the seven negative votes from the seventy-five cast during the whole day, or from the thirty-five cast within legal hours, would leave more than two-thirds in favor of the bond issue, and in either event the expression of the required number of qualified taxpayers and residents of the library district readily appears.

The following authorities cited by respondent state the same rule as that enunciated in those from which we have quoted, and for the same reasons hold the elections involved

to have been invalid. *Directors of Fallbrook Irr. Dist.* v. *Abila*, 106 Cal. 365 [39 Pac. 793], failed to present a sufficient showing of the number of ballots cast during the time when the polls should have been closed, and hence it did not appear that the violation of the statute was harmless. *Anaheim Sugar Co.* v. *County of Orange*, 181 Cal. 212 [183 Pac. 809], was an appeal from a judgment of dismissal after sustaining a demurrer to the complaint upon the ground that it did not state facts sufficient to constitute a cause of action. The supreme court reversed the judgment, holding that the rule enunciated in *Kenworthy* v. *Mast, supra,* and *People ex rel. Escalle* v. *Town of Larkspur, supra,* had properly been invoked and that the complaint was not demurrable upon the ground alleged by the defendant, since it presented facts which, if proved, would invalidate the election.

We think that the writ of *mandamus* should issue directing the chairman of the board of supervisors of Los Angeles County to sign the bonds here in question, as prayed, and it is so ordered.

Thompson (Ira F.), J., and Stephens, J., *pro tem.,* concurred.