797 P.2d 285

**STATE of New Mexico, ex rel. ANGEL FIRE HOME AND LAND OWNERS ASSOCIATION, INC., a New Mexico Not–for–Profit Corporation; Herbert B. Steves and Jose C. Torres, Real Parties in Interest, Petitioners–Appellees,**

**v.**

**SOUTH CENTRAL COLFAX COUNTY SPECIAL HOSPITAL DISTRICT, a New Mexico Special Hospital District, et al., Respondents–Appellants,**

**and**

**Nor–Lea Hospital District, Intervenor–Appellant.**

No. 10945.

Court of Appeals of New Mexico.

June 21, 1990.

Certiorari Denied Aug. 8, 1990.

Harold Breen, Office of the Dist. Atty., Taos, for respondents-appellants.

Frank R. Coppler, Coppler & Aragon, Santa Fe, Steven Barshov, New York City, for petitioners-appellees.

James E. Templeman, Templeman and Crutchfield, Lovington, for intervenor-appellant, Nor–Lea Hosp. Dist.

Joel M. Carson, Losee, Carson, Haas & Carroll, P.A., Artesia, for Artesia General Hosp., amicus curiae.

## OPINION

HARTZ, Judge.

The South Central Colfax County Special Hospital District (the "hospital district") and other appellants seek reversal of the district court's ruling that the New Mexico Special Hospital District Act, NMSA 1978, Sections 4–48A–1 to –18 (Repl.Pamp.1984 & Cum.Supp.1989) (the "SHDA") is unconstitutional. The district court held that the SHDA unconstitutionally delegates legislative powers to private persons. In seeking to uphold the district court's decision, the Angel Fire Home and Land Owners Association, Inc. and other appellees (the "Land Owners") contend that the SHDA is unconstitutional on its face because (1) it does not appropriately limit the discretion of private persons to determine the boundaries of special hospital districts, thereby impermissibly delegating the legislative power of the state; (2) it allows private persons arbitrarily to include property in a special hospital district even though the property and its inhabitants will not be benefited by inclusion; (3) it does not require district boundaries to be rationally related to creation of a reasonable special hospital district; and (4) it contains no mechanism by which a property owner whose property is not benefited by inclusion within the special hospital district can request an independent tribunal to remove the land from the proposed special hospital district. We reverse.

## THE SHDA

The SHDA authorizes creation of special hospital districts for "constructing, acquiring, operating and maintaining one or more public hospital facilities for the benefit of the inhabitants of the district."

§ 4–48A–3(A). If the district is composed of portions of more than one county, the portion in each county is called a "subdistrict." § 4–48A–2(E). When a petition for creation of a district is signed by enough registered voters in each subdistrict (ten percent of the votes cast for governor in the subdistrict at the last general election, § 4–48A–4(B)), the issue is submitted to a vote of the registered voters residing in the proposed district. § 4–48A–5. The district must be approved by a majority vote in each subdistrict. § 4–48A–5(F). The governing body of the district is a board of trustees consisting of at least five members—one elected by each subdistrict and the remainder elected at large. § 4–48A–6. To supplement income from hospital facilities, the district may raise money through assessment of ad valorem taxes to finance general obligation bonds, § 4–48A–14, or to pay for the operation and maintenance of hospitals and the operational costs of the district. § 4–48A–16. General obligation bonds (which are for such purposes as the purchase, construction or renovation of a hospital facility, § 4–48A–12) may be issued only after approval in a district-wide election. § 4–48A–12. Ad valorem taxes for operational and maintenance expenses can be imposed only with the approval of the voters in each subdistrict within the district. § 4–48A–16.

The territorial area to be included in the district must be designated in the petition seeking creation of the district. § 4–48A–4(A). The boundaries must satisfy the requirements of Section 4–48A–2(C), which reads:

"[S]pecial hospital district" means a district wherein a public hospital is located or is proposed to be created, and which:

(1) is composed of contiguous and compact territory lying wholly within a single county; or

(2) is composed of contiguous and compact territory which includes all or a portion of two or more counties or any combination thereof; and

(3) contains within its boundaries one or more incorporated municipalities; or whose boundaries coincide and are con-

current with the territorial areas of one or more political subdivisions within such county or counties[.]

A special hospital district cannot include territory already included within another special hospital district. § 4–48A–3(B).

The core of the Land Owners' arguments is that the SHDA does not preclude proponents of a special hospital district from drawing the boundaries of a district so as to impose a substantial portion of the tax burden upon areas that do not materially benefit from the district. They cite their own situation as an example of such impropriety. The area of the hospital district coincides with the area of three contiguous school districts within Colfax County. The Land Owners assert that the Moreno Valley (where the Land Owners reside) contains only one-fourth of the electorate but one-half of the property tax base for the hospital district. They contend that the Moreno Valley will not benefit from the district, because the only hospital presently within the boundaries of the district is significantly farther away from the valley than the hospital in Taos, which is thirty miles from Angel Fire, within an adjacent county. Thus, in their view, they will not receive any benefit from the district but were included within the district only because its proponents, who reside in other portions of the district, wanted the Moreno Valley residents to pay half the costs of the district.

DISCUSSION

A. Alleged Disproportion Between Benefits and Tax Burden

The Land Owners' various arguments can be placed in proper perspective by first addressing their second argument—that the SHDA allows private persons arbitrarily to include property in a special hospital district even though the property and its inhabitants will not be benefited by inclusion.

This contention finds some support in *Myles Salt Co. v. Board of Commissioners of the Iberia & St. Mary Drainage District,* 239 U.S. 478, 36 S.Ct. 204, 60 L.Ed. 392 (1916). The salt company had alleged in its pleading that its land had been included within a drainage district "[s]olely with the view of deriving revenues from the assessment of [the land] * * * and only for the benefit of the other properties and not upon the theory that a general scheme of drainage would inure to the benefit of all of the property therein, even indirectly * * *." *Id.* at 482, 36 S.Ct. at 205. The company further alleged that the district's drainage scheme was not intended to confer any benefit on the company's land and that the scheme could not possibly confer any benefit. The Supreme Court stated that a "drainage district has the special purpose of the improvement of particular property." *Id.* at 485, 36 S.Ct. at 206. Therefore, to include the company's property solely to pay for benefits to other property, when the company's property cannot be benefited, even indirectly, constitutes a deprivation of property without due process of law.

*Myles Salt,* however, presents a rare, if not unique, factual situation. Because the company's suit had been dismissed for failure to state a cause of action, the Court had to accept the assertion that the company could not possibly benefit from the special district. Proof of such a claim would ordinarily be extremely difficult. Thus it is not surprising that "the *Myles Salt* decision seems to stand virtually alone. Few if any decisions invalidating special district boundaries have followed in its wake." F. Michelman & T. Sandalow, *Materials on Government in Urban Areas: Cases— Comments—Questions* Ch. 3, at 524 (1970). *Accord Furey v. City of Sacramento,* 780 F.2d 1448, 1454 n. 5 (9th Cir. 1986) (*Myles Salt* has rarely been invoked in the federal courts in the past seventy years).

Rather than expanding upon *Myles Salt,* courts have been more impressed with the sentiment expressed in *Carmichael v. Southern Coal & Coke Co.,* 301 U.S. 495, 522–23, 57 S.Ct. 868, 878–79, 81 L.Ed. 1245 (1937) (upholding unemployment compensation act), in which the United States Supreme Court wrote:

A tax is not an assessment of benefits. * * * The only benefit to which the

taxpayer is constitutionally entitled is that derived from his enjoyment of the privileges of living in an organized society, established and safeguarded by the devotion of taxes to public purposes. Any other view would preclude the levying of taxes except as they are used to compensate for the burden on those who pay them, and would involve the abandonment of the most fundamental principle of government—that it exists primarily to provide for the common good. A corporation cannot object to the use of the taxes which it pays for the maintenance of schools because it has no children. This Court has repudiated the suggestion, whenever made, that the Constitution requires the benefits derived from the expenditure of public moneys to be apportioned to the burdens of the taxpayer, or that he can resist the payment of the tax because it is not expended for purposes which are peculiarly beneficial to him. [Citations & footnote omitted.]

*Accord Gomillion v. Lightfoot,* 364 U.S. 339, 343, 81 S.Ct. 125, 128, 5 L.Ed.2d 110 (1960) ("Due Process Clause affords no immunity against mere inequalities in tax burdens"). New Mexico has followed this reasoning in *Lung v. O'Chesky,* 94 N.M. 802, 617 P.2d 1317 (1980) (upholding imposition of income tax on Texas residents who worked in New Mexico), *appeal dismissed,* 450 U.S. 961, 101 S.Ct. 1475 67 L.Ed.2d 610 (1981) and *Tiffany Construction Co. v. Bureau of Revenue,* 93 N.M. 593, 603 P.2d 332 (Ct.App.1979) (gross receipts tax), *vacated,* 448 U.S. 902, 100 S.Ct. 3041, 65 L.Ed.2d 1132 (1980), *on remand,* 96 N.M. 304, 629 P.2d 1233 (1980), *aff'd in part and rev'd in part,* 96 N.M. 296, 629 P.2d 1225 (1981).

Challenges to local governmental boundaries by those who contend that the tax burdens arising from inclusion far exceed the benefits are usually answered by pointing to promotion of the general welfare. In *Ruberoid Co. v. North Pecos Water & Sanitation District,* 158 Colo. 498, 408 P.2d 436 (1965) (En Banc), the court rejected a claim that land not specially benefited by the district should be excluded. The

court said that water and sanitation districts are not created to improve property, but for the public health and welfare.

In *State ex rel. Pan American Production Co. v. Texas City,* 157 Tex. 450, 303 S.W.2d 780 (1957), *appeal dismissed,* 355 U.S. 603, 78 S.Ct. 533, 2 L.Ed.2d 523 (1958), a city annexation included uninhabitable land which allegedly could not benefit from municipal services. The court said, "Benefits may be intangible and incapable of exact ascertainment, but it is constitutionally sufficient if taxes are uniform and are for public purposes in which the City has an interest." *Id.* at 455, 303 S.W.2d at 783. *Cf. Carter v. Hamlin Hosp. Dist.,* 538 S.W.2d 671 (Tex.Ct.App.1976) (no denial of equal protection in legislature's including within hospital district an area whose owners will pay 40% of the taxes but will not use the hospital), *cert. denied,* 430 U.S. 984, 97 S.Ct. 1680, 52 L.Ed.2d 378 (1977).

*People ex rel. Honefenger v. Burris,* 408 Ill. 68, 95 N.E.2d 882 (1950), recognized that the purpose for creation of a park district encompassing a city and its environs was to raise more taxes to maintain parks previously created within the city. Seventy-five percent of the revenue would come from district property outside the city. Yet, the court rejected a challenge to the district based on a claim of taxes being disproportionate to benefits.

Similarly, the trial court in *California Portland Cement Co. v. Picture Rocks Fire District,* 143 Ariz. 170, 692 P.2d 1019 (Ct.App.1984), found that the cement company's property annexed to the fire district would receive no benefit from inclusion and would be responsible for 60% of the taxes paid to the district. But the court, finding fire districts to be quasi-municipal corporations rather than quasi-improvement districts, upheld the annexation, rejecting the view that an annexation solely to raise revenue may be declared void.

Although some courts scrutinize more closely claims of disproportionate tax burdens, *see, e.g., Sperry Rand Corp. v. Town of North Hempstead,* 53 Misc.2d 970, 280 N.Y.S.2d 600 (1967) (inadequate garbage

collection service provided to major taxpayer), our supreme court appears to adopt the view of Illinois and our neighbors Arizona, Colorado, and Texas. In *Albuquerque Metropolitan Arroyo Flood Control Authority v. Swinburne,* 74 N.M. 487, 493, 394 P.2d 998, 1002 (1964), answering a challenge to the creation of a local flood control authority, the court wrote:

> The fact that there may be residents or property owners in some portions of the area who receive a greater benefit than others, or that some actually receive no benefit from the improvements and are in no apparent danger of damage from floods, cannot stand in the way of a general governmental policy declared by the legislature in the interest of the public welfare and benefit.

To be sure, on occasion legislatures provide for the assessment of property taxes in direct proportion to benefits received, as when improvement districts are established. *See* NMSA 1978, § 3–33–1 (Repl. Pamp.1984); *see also Altman v. Kilburn,* 45 N.M. 453, 116 P.2d 812 (1941), 136 A.L.R. 554 (1942). Yet, failure of the legislature to provide for such a method of assessment is not necessarily an oversight. In some circumstances, special assessments are inappropriate because the governmental activity does not so much improve or benefit property as it promotes general welfare. *See Heavens v. King County Rural Library Dist.,* 66 Wash.2d 558, 404 P.2d 453 (1965) (En Banc) (invalidating legislation permitting special assessments to pay for library, because library is for general welfare of the community at large, not to enhance value of specific property). Special hospital districts have the latter function; they are designed to promote public health rather than to provide a specific benefit to real estate. Moreover, the legislature may properly have the *purpose* of imposing a tax that is disproportionate to benefits in order to redistribute income. *See* F. Michelman & T. Sandalow, *supra,* at 511.

In short, there appears to be no constitutional prohibition against including property within a special hospital district even though the property and its inhabitants will not benefit from inclusion. We need not, however, rely on that proposition in its extreme form. As we will explain later in this opinion, we fail to see how one could establish a total absence of benefit from inclusion in a special hospital district of relatively limited boundaries. Thus we will not hold the SHDA unconstitutional on its face solely because the tax/benefit ratio for certain property owners may differ from that for others within a special hospital district.

The Land Owners point out, however, that the disproportion between burdens and benefits is not the consequence of direct action by a legislative body; rather, the disparity is the consequence of the drawing of district boundary lines by the private persons who petition for creation of the district and benefit from the alleged unfairness. In other words, although creation of a district in which benefits and burdens are distributed disproportionately is not per se violative of substantive due process, the *method* of creation of a district may be constitutionally suspect if it improperly encourages such a result. The distinction between acts of a legislative body and collective acts of the electorate is a legitimate one. *See* L. Tribe, *American Constitutional Law* § 17–2, at 1678 n. 7 (2d ed. 1988); *see also* Wolfinger & Greenstein, *The Repeal of Fair Housing in California: An Analysis of Referendum Voting,* 62 Am.Pol.Sci.Rev. 753, 767–69 (Sept.1968). We address the issue as part of the Land Owners' more general claim that the SHDA improperly delegates legislative authority to private persons.

## B. Delegation of Authority

### 1. *Deer Mesa* and *Daniels*

The Land Owners rely on *Deer Mesa Corp. v. Los Tres Valles Special Zoning District Commission,* 103 N.M. 675, 712 P.2d 21 (Ct.App.1985), which invalidated the Special Zoning District Act, NMSA 1978, Sections 3–21–15 to –26 (Repl.1985). The Zoning Act provided for the creation of districts and the election of commissioners who possessed power to zone within the

district. A district could be created if at least 51% of the registered voters residing within the proposed district signed a petition requesting a special zoning district. Three limitations were imposed on the boundaries of a district: (1) the district could not include territory within the boundary limits of an incorporated municipality; (2) it needed to include at least 150 single-family dwellings; and (3) it could not include territory within a county that had already adopted a general zoning ordinance applicable to all areas in the county outside of incorporated municipalities. We held that the Zoning Act was void as an unconstitutional delegation of legislative power, because it permitted "private individuals to 'create' a special zoning district without any limitation on the size and location of the district," and "[t]here [was] no standard to guide the private individuals in determining the size or location." *Id.* at 683, 712 P.2d at 29.

The district, on the other hand, points to *Daniels v. Watson,* 75 N.M. 661, 410 P.2d 193 (1966), in which our supreme court upheld the Junior College Act. NMSA 1978, §§ 21–13–1 to –25 (Repl.Pamp.1988) (previously codified as NMSA 1953, Repl. Vol. 11, part 1, §§ 73–33–1 to –20 (Supp. 1965)). The Junior College Act authorized an election to approve a junior college district if enough voters in the proposed district signed a petition calling for the district. The boundaries of the district were defined by the petition. The court held:

> This is not a delegation of power, but merely a statutory method for implementing the legislative determination of a purpose to be fulfilled. It should be apparent that no act of the legislature can be so detailed as to provide for every possible contingency—something must be left to those who desire to take advantage of the broad general statute, and this is exactly the type of legislation we have here. There is no violation of the constitutional prohibition concerning separation of powers. [Citations omitted.]

*Id.* at 668–69, 410 P.2d at 197–98.

*Deer Mesa* distinguished *Daniels* on the ground that the Junior College Act "provided territorial limits," whereas the Zoning Act "identifies territory that may not be included in the district but provides no limitation on the amount of territory or the location of territory which may be included." *Id.* 103 N.M. at 682, 712 P.2d at 28. Our task, then, is to decide whether this case is, as the Land Owners contend, more similar to *Deer Mesa* than to *Daniels,* or, as the hospital district sees it, more like *Daniels.*

The Land Owners point out that the districts created under the Junior College Act were required to be composed of one or more school districts, whose boundaries had already been drawn with reference to the educational needs of the residents of the district, whereas the boundaries of special hospital districts can comply with the SHDA merely by coinciding with those of special districts whose purposes (such as education or irrigation) bear no apparent relationship to the need for a hospital. *Daniels'* discussion of the claim of improper delegation, however, makes no reference to the relationship between junior college districts and school districts. Likewise, although the Land Owners note that the Junior College Act, unlike the SHDA, required review by an independent tribunal (the board of educational finance) of the suitability of the proposed boundaries of a district, *Daniels* did not rely on the existence of that review.

Using a similar form of argument, the district emphasizes that *Deer Mesa's* zoning districts could be composed of isolated regions scattered throughout the state, whereas special hospital districts are required by the SHDA to be compact and contiguous, and cannot even cross county lines unless a majority of the district voters in each county approve the district. Yet, *Deer Mesa* does not tell us whether the Zoning Act would have been upheld if such additional requirements had been imposed on the boundaries of zoning districts.

To better understand the import of *Deer Mesa,* we must examine the vice that required the application of the improper-delegation doctrine in that case. The apparent concern in *Deer Mesa* was that some

502

private citizens could control for improper purposes the use of private property owned by others. This concern has been expressed in several decisions of the United States Supreme Court.

In *Eubank v. City of Richmond*, 226 U.S. 137, 33 S.Ct. 76, 57 L.Ed. 156 (1912), the Court declared unconstitutional an ordinance providing:

> "That whenever the owners of two-thirds of the property abutting on any street shall, in writing, request the committee on streets to establish a building line on the side of the square on which their property fronts, the said committee shall establish such line so that the same shall not be less than five feet nor more than thirty feet from the street line. * * * And no permit for the erection of any building upon such front of the square upon which such building line is so established shall be issued except for the construction of houses within the limits of such line."

*Id.* at 141, 33 S.Ct. at 76 (quoting Virginia Act of 1908, ch. 349). The Court noted that

> [T]he property holders who desire and have the authority to establish the line may do so solely for their own interest or even capriciously.

*Id.* at 144, 33 S.Ct. at 77.

In *Washington ex rel. Seattle Title Trust Co. v. Roberge*, 278 U.S. 116, 49 S.Ct. 50, 73 L.Ed. 210 (1928), the Court invalidated an ordinance that stated, " 'A philanthropic home for children or for old people shall be permitted in First Residence District when the written consent shall have been obtained of the owners of two-thirds of the property within four hundred (400) feet of the proposed building.' " *Id.* at 118, 49 S.Ct. at 50–51 (quoting Seattle, Washington's Amended Ordinance No. 49,179, § 3(c) (1925)). The Court observed that the general zoning plan for the district established that the local "legislative body found that the construction and maintenance of the new home was in harmony with the public interest and with the general scope and plan of the zoning ordinance." *Id.* at 121, 49 S.Ct. at 52. Thus the ordinance it invalidated had delegated authority to pri-

vate citizens to take action contrary to the public interest. *But cf. Thomas Cusack Co. v. City of Chicago*, 242 U.S. 526, 37 S.Ct. 190, 61 L.Ed. 472 (1917) (upholding ordinance that bans billboards but permits their erection if owners of a majority of the frontage on the block in which the billboard is to be erected give their written consent); F. Michelman & T. Sandalow, *supra*, at 120–21 (questioning the theoretical underpinning of the application of improper-delegation doctrine in the *Eubank–Roberge* context).

We read *Deer Mesa* as similarly founded on apprehension about enabling private citizens to act contrary to the public interest in imposing constraints on the use of private property owned by others. For example, under the Zoning Act invalidated by *Deer Mesa*, one region of the state that competed in some industry or commercial activity against a less populous region could gain an unfair competitive advantage. The more populous region could, without approval from any resident of the other region, establish a zoning district encompassing both regions, which would have the power to impose zoning restrictions that would disfavor enterprises in the less populous region. It is apparent that in enacting the Zoning Act, the legislature did not consider such potential for abuse and included no provisions to reduce that potential.

We now examine the SHDA, to determine whether it similarly fails to provide adequate safeguards against abuse.

### 2. The SHDA

Special hospital districts do not control the use of private property. They do not exercise a regulatory power akin to that involved in *Deer Mesa*, *Eubank*, and *Roberge*. The power delegated to the district is the power to tax property within the district for the public purpose of providing health care. What, then, is the potential vice in delegating the authority to draw boundaries for special hospital districts? The sole potential abuse described by the Land Owners is that proponents of the district may draw its boundaries so as to

raise substantial tax revenue from those who will not benefit from the hospital facilities provided by the district.

Before evaluating whether the potential for abuse under the SHDA is excessive, we put the issue in perspective. First, Article IV, Section 24 of the New Mexico Constitution encourages, if it does not mandate, some delegation of legislative authority in setting boundaries for local governments. That section expressly prohibits the state legislature from incorporating cities, towns, or villages. Although it does not specifically forbid legislative formation of other local governmental bodies, it states that "where a general law can be made applicable, no special law shall be enacted." Thus, the legislature should, if possible, set guidelines for the creation of special hospital districts, without itself specifying the boundaries.

Second, in funding a special hospital district, there is no way to avoid the imposition of tax burdens greatly disproportionate to benefits. Health-conscious residents may use hospital facilities less often than heavy smokers; small families, less than large ones. If the tax is an ad valorem tax, a non-resident land owner could pay substantial taxes with only a minimal, if any, direct benefit, while a resident who owns no property (as well as non-resident tourists who need medical attention) may receive substantial benefits without paying any taxes. The practical impossibility of drawing the boundaries of a district created to benefit the public welfare in such a way that a uniform tax rate will result in equivalent cost/benefit ratios for all inhabitants or all property within the district is surely one reason why courts have rejected contentions that particular legislatively created districts impose disproportionate burdens upon specific taxpayers.

■ It follows from the above two observations that the legislature cannot provide for special hospital districts without delegating authority to create districts within which tax burdens will be disproportionate to the benefits arising from the district. The question of whether it is "fair" to include property within a district is necessarily one of degree. We know of no method of quantifying the calculation of fairness. All one can expect of the legislature is that it set outer limits that prevent gross inequities. We believe that the SHDA is adequate in that regard.

For example, the SHDA prohibits incorporation of an area into two different hospital districts. Subjecting one area to taxation by two districts contravenes legislative policy. Similarly, by requiring each subdistrict separately to approve a special hospital district, the SHDA prohibits voters in one county from compelling residents of another county to belong to the same district. The statutory requirements that districts be contiguous and compact prevent voters in one portion of a county from expanding the tax base of a district by reaching out to include any territory they wish. In addition, and perhaps most importantly, the SHDA states that the activities of the district are to be conducted "for the benefit of the inhabitants of the district," § 4–48A–3(A), thereby requiring that the district provide benefits to all areas within it. Even if this language is merely directory, an issue we need not reach here, we must presume, when a statute is challenged on its face, that sworn public officials—the board of trustees of the district—will act in accordance with their statutory duties. *Cf. Davis v. Westland Dev. Co.,* 81 N.M. 296, 466 P.2d 862 (1970) (it is presumed that public officials perform their duties). One method by which the district can serve its inhabitants is, of course, to provide new hospital facilities for portions of the district that had no facilities when the district was created. Thus, the balance between benefits and burdens for those residing in a particular portion of the district cannot necessarily be determined by what benefits are available at the outset of the district's existence.

Consider the South Central Colfax County Special Hospital District. Although the Moreno Valley is closer to the Taos hospital than to the only hospital existing in the district, employees of those owning property in the valley may well live nearer to the district's hospital and benefit from it, to the

advantage of their employers. Also, residents of the valley surely have occasion to travel in the vicinity of that hospital, so they would benefit if emergency care is needed as a result of a motor vehicle accident. In the absence of an emergency, residents of the valley may prefer using the district's facility even though travel time is greater—perhaps because a recommended physician finds it more convenient. In addition, as noted above, the district may in the future supplement the one hospital already present in the district. A satellite facility in the Moreno Valley could be established to benefit the residents there.

We see no reason to doubt that the legislature made a considered judgment that districts created in accordance with the SHDA would not impose unfair burdens on taxpayers within such districts. Indeed, we presume that the legislature made that judgment, because "every presumption is to be indulged in favor of the validity and regularity of legislative enactments." *In re Estate of Welch*, 80 N.M. 448, 449, 457 P.2d 380, 381 (1969). The legislature properly could have decided that the SHDA adequately prevents unfairness by requiring that districts (1) be compact and contiguous, (2) be separately approved in each subdistrict, and (3) be governed "for the benefit of the inhabitants of the district." Given the limitations imposed on districts by the statute, we conclude that the statute withstands the constitutional challenge. The extreme circumstances of *Deer Mesa* are not present.

We are not persuaded by the Nebraska cases relied upon by the Land Owners: *Elliott v. Wille*, 112 Neb. 78, 200 N.W. 347 (1924), and *Summerville v. North Platte Valley Weather Control District*, 170 Neb. 46, 101 N.W.2d 748 (1960). Both decisions invalidated legislation authorizing the creation of special districts because the proponents of a district determined its boundaries in the petition for creation of the district. To the extent that the results in those cases turned on the absence of an opportunity for individuals to challenge inclusion of their property in the district on the ground that the district would not

serve the public health, convenience, or welfare, the SHDA is distinguishable, because special hospital districts on their face serve the public health and welfare. Moreover, the sole vice identified in these opinions with respect to the power to draw boundaries is that those petitioning to form a district could gerrymander the boundaries to include all of a person's land except a small plot including the residence, thus depriving the person of the right to vote in a district taxing the bulk of the person's land. That specific vice could not arise under the SHDA because of the requirement that districts be compact and contiguous.

We find more persuasive those cases from other jurisdictions that recognize a tradition of citizens determining the boundaries of their own local governments. In *Yribarne v. County of San Bernardino*, 218 Cal.App.2d 369, 32 Cal.Rptr. 847 (1963), *appeal dismissed*, 376 U.S. 783, 84 S.Ct. 1134, 12 L.Ed.2d 83 (1964), the court reviewed a half-century of California precedents in reaffirming that the boundary of a municipal water district could be established by those petitioning for its creation, subject only to approval by a majority vote of those within the proposed boundary. Similarly, in *Consolidated School District No. 41 v. Dacus*, 189 Okla. 400, 117 P.2d 508 (1941), the Oklahoma Supreme Court held that the legislature had not improperly delegated its authority by permitting voters within a portion of a school district to petition for an election to detach their area from the school district and annex it to another, regardless of potential harm to the remainder of the district. *See also Ruberoid Co. v. North Pecos Water & Sanitation Dist.* (although court empowered to determine whether property should be included or excluded in a water and sanitation district, court should not exclude property solely because it receives no special benefit).

Particularly pertinent is *People ex rel. Royal v. Cain*, 410 Ill. 39, 101 N.E.2d 74 (1951). The court rejected the claim that a statute like the SHDA improperly delegated authority to those who set forth the

boundaries of a hospital district in a petition for the creation of the district. Voters in the proposed district could create the district by majority vote. The sole restrictions on the boundaries of such a district were: (1) the district could not be in a county of greater than 500,000 population; (2) the district must have a population of more than 10,000; (3) the district could not divide a municipality or include part of an existing district; and (4) the district must be contiguous. With respect to the concerns raised by the Land Owners regarding unfair drawing of boundaries, these provisions of the Illinois statute are indistinguishable from, if not less restrictive than, the SHDA. In Illinois, compliance with the statutory requirements is determined by a court (rather than by county officials, as provided in the SHDA, Section 4–48A–4) but that difference is of no import.

A more noteworthy difference between the two statutes is that the Illinois act provided a procedure for detachment of a municipality or township from a district if 50% of its voters petitioned for detachment promptly after the original election. Yet the distinction does not help the Land Owners' argument. First, the detachment provision was a limited one. If a comparable provision had been adopted as part of the SHDA, perhaps the Land Owners living within the municipality of Angel Fire could have opted out, but other residents of the Moreno Valley could not have obtained relief.

Second, if a more general detachment provision (one not limited to municipalities and townships) were provided, then permitting the boundaries of the detached area to be set by those petitioning for detachment would presumably be as much an improper delegation of authority as permitting the original petitioners to draw boundaries for the proposed district. Property owners within the detached area could allege that those seeking detachment were acting selfishly.

Third, and most importantly, the Illinois Supreme Court did not rely on the detachment provision to establish a lawful delegation of authority. On the contrary, it specifically reaffirmed its holding in *People ex rel. Honefenger v. Burris* that detachment need not be permitted. *Id.*, 410 Ill. at 57–58, 101 N.E.2d at 83. The court relied on the general proposition that

> [t]he procedure of allowing the inhabitants of an area to organize for a particular purpose, according to standards established by the legislature, compliance with which must first be ascertained by the court, is an established practice incidental to local self-government. The hospital district is created, not by the petitioners, but by the voters at an election authorized by the legislature.

*Id.* at 50, 101 N.E.2d at 79–80.

This is not to say that courts cannot review the boundaries of special hospital districts or consider claims that districts are not performing in accordance with the statutory duty of providing "hospital facilities for the benefit of the inhabitants of the district." § 4–48A–3(A). We need not decide those issues now. The pertinent point is that the mere possibility of improprieties does not require invalidation of the SHDA. We recognize that in *Deer Mesa* we applied the principle: " 'It is not what has been done but what can be done under a statute that determines its constitutionality.' " *Id.* 103 N.M. at 683, 712 P.2d at 29 (quoting *State ex rel. Holmes v. State Bd. of Fin.*, 69 N.M. 430, 440, 367 P.2d 925, 932 (1961)). On the other hand, a second principle states, "[T]he mere fact that a law may afford the opportunity for abuse in the manner of application is no objection to the law itself from the standpoint of its constitutionality." *Gutierrez v. Middle Rio Grande Conservancy Dist.*, 34 N.M. 346, 357, 282 P. 1, 6 (1929), *cert. denied*, 280 U.S. 610, 50 S.Ct. 158, 74 L.Ed. 653 (1930). In other words, although an improper delegation cannot be cured by the delegatee's self-imposed constraints, courts should not base their judgments of constitutionality on speculation about possible abuses. The difference in application between the two principles is essentially a matter of degree. In this case we believe that the potential for abuse is sufficiently small that there is no reason to strike the SHDA itself. Whether a particular district is created or acts in

violation of the SHDA or the United States or New Mexico Constitutions can be resolved through specific litigation without bringing down the entire house. We reject the Land Owners' first two contentions and hold that the SHDA does not unconstitutionally delegate legislative authority.

## ALLEGEDLY IRRATIONAL BOUNDARY REQUIREMENTS

■ The Land Owners' third contention is that the SHDA does not require district boundaries to be rationally related to creation of a reasonable special hospital district. They focus on Section 4–48A–2(C)(3), which requires that the boundaries of a special hospital district either (1) contain one or more incorporated municipalities or (2) coincide and be concurrent with the boundaries of one or more political subdivisions. They point out that the boundaries of a district could be created by mixing and matching the boundaries of political subdivisions that have no apparent relationship to health care, such as school or irrigation districts. Alternatively, they note, a special hospital district could include an incorporated municipality and take on a variety of shapes and sizes.

Insofar as the Land Owners' contention is part of their claim of improper delegation, we reject it. We have already held that the SHDA prescribes sufficient constraints to overcome that claim. Our reasoning did not rely on the provisions of Section 4–48A–2(C)(3). Those provisions do not give proponents of a district additional authority. On the contrary, they impose further limitations. Thus, even if Section 4–48A–2(C)(3) were irrational, it could not convert a sufficiently limited delegation of authority into an improperly excessive delegation.

In any case, we do not find the provisions of Section 4–48A–2(C)(3) to be irrational for a legislature to impose. Although these provisions bear no relation to the specific purpose of a special hospital district—the creation and maintenance of hospitals— they do have a rational relationship to the establishment of a new local governmental body. Requiring a special hospital district to include at least one incorporated municipality or political subdivision will provide some comfort to the legislature that the district will have a minimally sufficient tax base, sense of community, and recognized leadership. The requirements can also be of some administrative assistance, in making it easier to determine the tax base for the district. The Land Owners have not established that these provisions violate substantive due process. *See Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976) (one complaining of violation of substantive due process in economic arena has burden of establishing that legislature acted in arbitrary and irrational way).

Moreover, we disagree with the Land Owner's apparent contention that delegation of authority to draw boundaries for a special hospital district is impermissible unless the legislature affirmatively requires that the boundaries bear a rational relationship to the purpose of a district. The Land Owners fail to explain what is meant by reasonable boundaries for a special hospital district. After all, each district has the statutory obligation to provide hospital facilities for the benefit of all of the inhabitants of the district. If a facility in a district will not substantially benefit some of the inhabitants in the district, a separate facility for those inhabitants could be provided. Boundaries in themselves do not determine the level of services to be provided. At least theoretically, any particular area could have any particular facilities regardless of the location of the district's boundaries. Insofar as the Land Owners are suggesting that a district must be so demarcated that hospital facilities can be provided efficiently to the inhabitants, the requirements of compactness and contiguity should alleviate concern in that regard, particularly when there is a check on the size of such districts by requiring each subdistrict separately to approve the district. Finally, to the extent that the Land Owners are contending simply that the SHDA must require that the boundaries reflect a concern for a reasonable balance between benefits and burdens from the district, we have already held that the Act satisfactorily protects against abuse in that

regard. *Cf. Carter v. Hamlin Hosp. Dist.* (determination of boundaries of hospital district is a political function).

REVIEW BY INDEPENDENT TRIBUNAL

■ The Land Owners' final claim is that the SHDA is invalid because it contains no mechanism by which a property owner whose property is not benefited by inclusion within the special hospital district can request an independent tribunal to remove the land from the proposed district. This argument is based on several faulty premises. First, as we have already stated, the propriety of inclusion of property within the district is not dependent upon benefit to the *property*. The purpose of the district is to benefit the *inhabitants* of the district, not the property.

Second, as a factual matter, we doubt the possibility that an inhabitant of the district would not benefit from the existence and operation of the district, even if the inhabitant's residence is closer to a hospital outside the district than to the only facility existing in the district at the time of the creation of the district. We have already noted the variety of benefits that can accrue to inhabitants of the district, particularly as new facilities are opened.

Third, the absence of any special benefit to a particular piece of property is not a sufficient ground for excluding the property from a district whose purpose is to promote the general welfare, *see, e.g., California Portland Cement Co. v. Picture Rocks Fire Dist.*, even when the legislature has provided for judicial review of the appropriateness of district boundaries. *See Ruberoid Co. v. North Pecos Water & Sanitation Dist.* If evidence establishing absence of a special benefit does not require exclusion, why should a forum to hear such evidence be required?

Thus, although the legislature may find it appropriate to have independent tribunals review boundary decisions to determine if they promote the public interest, *see* NMSA 1978, § 3–2–3(B)(3) (Repl.Pamp. 1987) (those desiring to incorporate a new municipality within "urbanized territory" may need to prove that the proposed municipality could provide municipal services before the neighboring municipality could do so), the legislature need not provide for such review. We agree with *Yribarne* that "the Legislature has the rightful power * * * to authorize the formation of a district [created to promote the general health and welfare, rather than to benefit specific property] without any hearing preliminary to the election as to whether the land included will be benefited." *Id.*, 218 Cal.App.2d at 375, 32 Cal.Rptr. at 850; *see id.* at 376, 32 Cal.Rptr. at 853, quoting *In re Bonds of Orosi Pub. Util. Dist.*, 196 Cal. 43, 235 P. 1004 (1925). *Cf. People ex rel. Honefenger v. Burris*, 408 Ill. at 78–79, 95 N.E.2d at 888 (no right to a provision for withdrawal from district); *California Portland Cement Co. v. Picture Rocks Fire Dist.* (no due process right (1) to notice of annexation or (2) to protest annexation).

CONCLUSION

For the foregoing reasons, we reverse the district court's grant of summary judgment in favor of the Land Owners.

DONNELLY and ALARID, JJ., concur.